PUBLISHED

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **18th** *day of* **June, 2024**.

Marvin Leon Grimm, Jr.,                                         Petitioner,

  against             Record No. 0741-23-2

Commonwealth of Virginia,                                   Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges Huff, AtLee, and Callins

On May 1, 2023, Marvin Leon Grimm, Jr., filed a petition seeking a writ of actual innocence based on biological and non-biological evidence. *See* Code §§ 19.2-327.10 through -327.14. In 1976, Grimm pleaded guilty to one count each of murder, forcible sodomy, and abduction with intent to defile in the homicide of C.H.[1] On March 15, 1976, the Circuit Court of the City of Richmond (the "circuit court") heard the Commonwealth's evidence against Grimm and accepted the guilty pleas. On May 25, 1976, the circuit court sentenced Grimm to two terms of life imprisonment plus 10 years. Since that time, Grimm has recanted his guilty pleas, asserted his innocence, and sought writs of habeas corpus and actual innocence.

Grimm's claim of innocence for these offenses rests on modern forensic testing of material evidence recovered from the victim and the assertion that his confession was coerced. In this petition, he presents the following newly discovered evidence for this Court's review: (1) DNA testing of the hairs recovered during the investigation; (2) DNA testing of swabs recovered during the victim's autopsy; (3) new analysis of the toxicology report performed during the autopsy; and (4) research into false confessions. The Commonwealth joins Grimm's petition for actual innocence and asks this Court to issue the writ.[2] *See* Code § 19.2-327.10:1.

---

[1] This Court uses only the initials of the child victim to protect his privacy.

[2] Although this Court acknowledges the Commonwealth's concession that Grimm has met his burden to establish all the required elements, that legal concession does not bind this Court. *Haas v. Commonwealth*, 74 Va. App. 586, 619 n.8 (2022). This Court is still required to independently review the record and reach its

Having considered Grimm's petition and exhibits, the Commonwealth's response joining the petition, and the record in this case, this Court concludes that Grimm has satisfied all the requirements of Code § 19.2-327.11(A) by a preponderance of the evidence. Accordingly, this Court grants the writ pursuant to Code § 19.2-327.13 and vacates the convictions.

## BACKGROUND[3]

### Murder of C.H. and Subsequent Investigation

On Saturday, November 22, 1975, around 1:30 p.m. three-year-old C.H. was seen entering the woods behind his family's apartment in Richmond, Virginia. Approximately an hour later his mother reported to the police that he was missing and within hours a massive search party, consisting of approximately 250 volunteers, began searching the surrounding area for the child.[4] This search ultimately concluded on November 26, 1975, when C.H.'s body was discovered on the southern banks of the James River. He was discovered face-up in shallow water, fully clothed, with his arms folded across his chest.

An autopsy determined C.H. died of asphyxia with no indication that he drowned or suffered physical injury. Oral, pharynx, and esophageal smears revealed spermatozoa and there was a "[m]oderate amount of tenacious mucoid secretions in [his] oropharynx." A toxicology report indicated "0.12% ethanol wt/vol.; [and] 0.6 mg% chloroxazazone" in C.H.'s blood, "0.13% ethanol wt/vol.; 1.5 mg% chloroxazazone" in C.H.'s liver fluid, and "5.5 mg acetaminophen; 130 mg chloroxazazone; and 0.41 ml of 100% ethanol" in C.H.'s stomach.[5]

---

own conclusion. *See Bush v. Commonwealth*, 68 Va. App. 797, 803 n.1 (2018) ("[W]hile we commend the Attorney General's candor, we review the record independent of this concession of law.")

[3] The facts herein are derived from Grimm's brief in support of his petition, which the Commonwealth has accepted in full.

[4] Grimm was at his apartment at 2:45 p.m. when police knocked on his door asking where the family of the missing child was. Based on the time C.H. went missing, this would require the abduction, sexual assault, and murder of C.H. to have occurred in a 75-minute window.

[5] Chloroxazazone appears to be a misspelling of chlorzoxazone, a prescription muscle relaxer.

In the weeks following C.H.'s disappearance, the Richmond Police Department ("RPD") investigated several leads with no success.[6] At this same time, C.H.'s disappearance and murder were the subject of considerable media coverage and public outrage. Due to his proximity to C.H.'s disappearance, Grimm was, in one way or another, involved in this investigation from the beginning. At the time of these events, Grimm was a 20-year-old Navy veteran and lived with his wife in the apartment across from C.H. Grimm first became involved with this case on the day C.H. went missing when the officers responding to C.H.'s mother's call knocked on Grimm's door and asked where the missing child lived. When officers interviewed C.H.'s father on November 24, 1975, he reported two arguments between himself and Grimm. First in response to Grimm running his lawnmower over children's toys left in the front yard of the apartment and second in response to C.H. playing outside in his underwear. On November 25, 1975, C.H.'s mother told police that "she felt Grimm was odd in his actions" before providing the same details as to the arguments between Grimm and C.H.'s father. In a December 5, 1975 letter to the F.B.I., Grimm is identified as a possible suspect "due to previous arguments and encounters with [C.H.'s] family prior to killing" with the notation that Grimm "resided directly across the hall" from C.H.'s family's apartment.

On December 16, 1975, Grimm was completing a nine-hour shift at work when he was picked up by police just before 5:00 p.m. and brought in for questioning. He was questioned until approximately 9:00 p.m. when he made a statement about blacking out and having seen C.H. around 3:00 p.m. the day he disappeared. At that point, Grimm was considered a suspect, read his *Miranda* rights, and police began questioning his background and family life.[7] At approximately 11:00 p.m., Grimm purportedly told police "what happened" and guided officers as they retraced the steps of C.H.'s abduction, murder, and disposal. Grimm and the officers returned to the interview room at approximately 2:20 a.m. and—after approximately 9 hours of

---

[6] RPD was known as the Richmond Bureau of Police at this time.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

questioning and 18 hours since Grimm began his workday—the officers recorded Grimm's statement for the first time.[8]

During this recorded statement, Grimm stated that on the morning of C.H.'s disappearance he was awoken by what appeared to be C.H. and another child throwing things at cars. As he was awake, he decided to go to his mother's home and get some food for the weekend. As he returned, C.H. and the other child asked Grimm if any of the food in the bag was for them, and where other local children were staying for the weekend.[9] Grimm went inside, noted it was about 12:45 p.m., and turned on a football game before blacking out. He then stated that he "left the house, went down and picked up [C.H.] down at . . . way down at a little laundry mat." Once he got him in the car, Grimm recalled that C.H. asked to be taken to 7-Eleven, but instead Grimm took him behind a nearby motel and "forced sexual assault on him." The officer recording Grimm's statement asked for clarification, resulting in the following exchange:

> [Officer]: What d . . . what . . . what do you mean you forced sexual assault on him?
>
> Grimm: I made, uh, . . .
>
> [Officer]: Did you make him place your privates in his mouth, is this how it happened?
>
> Grimm: Yes.

The officers then asked Grimm what he used "in reference to make [C.H.] do this?" to which Grimm replied "I, uh, the carpet cushioning knife, I use at work" before explaining that he did not actually pull the knife out, but rather just "tapped [C.H.] and said, 'If you don't, you may have a taste of that'" in reference to the knife. Grimm then explained that he "grabbed [C.H.'s] head forced it and [he] ejaculated" at which time C.H. "started choking and coughins [sic]." An officer asked "[y]ou ejaculated in his mouth?" and Grimm clarified

---

[8] This is the first time police recorded any of Grimm's statements since he entered their custody earlier that afternoon.

[9] These children are referred to as Skipper and Jamie. Based on the context of the statement it seems they may be Grimm's own children or the children his wife babysat, but that is unclear.

- 4 -

"Yeah. Started choking and coughing and then looked like he passed out right there in the seat. And, I thought he was . . . you know, I at first didn't know what was going on." Unsure of C.H.'s condition, Grimm reported that he

> didn't think nothing was wrong with [C.H.] at this time, so [he] proceeded . . . to the Seven-Eleven on Buford Road as [he] was passing by State Police Headquarter's turn road, tried to wake [C.H.] up, really panicked worse, slowed down, got ready to pull in, saw a bunch of cars and [he] decided [he] better keep going, proceeded to go down Buford Road and Jugenot, Hugenot Road down to Riverside Drive, where [he] dump the body in the river, took off, came . . . took the other way out to come up on Forest Hill Avenue and . . . Proceeded home.

After returning to his apartment Grimm resumed watching TV. When a neighbor informed him C.H. was missing he joined the search for C.H. Finally, the officers confirmed several of the details of the route Grimm led them on earlier in the interview—prior to this recorded portion—before asking him to confirm details of how he disposed of the body. Grimm informed the officers that he

> stopped the car in a little inlet [by the river], got out, covered [C.H.] up with a pea coat to make it look like a maimed animal or something, [he] was getting rid of, [he] can't exactly tell [] if [he] went down to the river, or threw [C.H.] from the top of a cliff there. . . . [W]hen [he] did that, . . . [he] whipped the pea coat back and [he] ran and jumped back in the car, took off.

The officers proceeded to ask Grimm if he slipped on the embankment, which he confirmed he did, and then he explained that he also tore his shoe and his socks got wet as a result.[10] Worth noting, this recorded confession makes no reference to the alcohol or drugs found in C.H.'s system, nor did it provide any new

---

[10] This exchange with the officer was as follows:

> [Officer]: Did you tell us you almost slipped on . . .
> Grimm: I slipped.
> [Officer]: . . . the embankment?
> Grimm: Almost slipped on the embankment or some hard surface, I remember that.
> [Officer]: Okay.
> Grimm: Cause, I tore my shoe open.

geographic information to the police. Indeed, the local media had already extensively discussed where the body was located.

On March 10, 1976, in light of this confession, and in exchange for the Commonwealth agreeing not to seek the death penalty in this case, Grimm pleaded guilty to murder, sodomy by force, and abduction with the intent to defile.[11] Importantly, Virginia law did not permit the death penalty for this type of offense at that time.[12] The circuit court accepted the guilty pleas subject to a factual basis shown by the evidence.

<u>Evidence Presented to the Circuit Court</u>

On March 15, 1976, the circuit court heard the Commonwealth's evidence against Grimm. At this hearing, in addition to testimony from the law enforcement personnel who obtained Grimm's confession and the confession itself, the Commonwealth presented forensic evidence that was submitted to the State Laboratory and analyzed by Forensic Scientist Mary Jane Burton. This evidence included Burton's lab report with results from testing several hairs found in Grimm's car on the floorboards and on a child's sock therein, as well as on a pea coat found in his apartment. She tested swabs of the pharynx, epiglottis, esophagus, nasal passage, and oral cavity taken during the autopsy and a towel recovered from Grimm's car that had a stain indicating the presence of seminal fluid. The medical examiner who performed the autopsy also testified as to her autopsy results and the presence of spermatozoa and a "thick white gelatinate material" in C.H.'s mouth.

Per Burton's lab reports and lab notes, she performed hair comparisons on all hair samples submitted and tested swabs from the autopsy and towels recovered from Grimm's car for the presence of sperm. From

---

[11] The writing specifically states: "I understand that as indicted, but particularized by the Commonwealth after negotiations, the maximum punishment is life imprisonment; that is, the Commonwealth will not pursue any conviction under Section 18.2-31, the so-called capital punishment section."

[12] At the time Grimm was charged, the death penalty was only available in three circumstances: (1) the "willful, deliberate and premeditated killing of any person in the commission of an abduction . . . when such abduction was committed with the intent to extort money, or a pecuniary benefit;" (2) the "willful, deliberate and premediated killing . . . for hire;" and (3) the "willful, deliberate and premeditated killing by an inmate in a penal institution." Code § 18.2-31 (1975).

these hair comparisons, Burton determined that three hairs recovered from the front seat and floorboard "[were] consistent with head hair samples from [C.H.]," that the child's sock recovered from the front seat "appeared to be smaller than the sock from [C.H.], but [the single] hair recovered from the sock was consistent with samples from [C.H.]," and that the four hairs recovered from the Navy peacoat found at Grimm's home were "consistent with samples from [C.H.]." Finally, with regard to the hair, Burton concluded that "[n]one of the hairs found consistent with the samples of [C.H.] were in any way similar to samples from [Grimm]." Burton's tests of the swabs taken from the autopsy indicated the presence of spermatozoa Type O. Her test of a stain on a towel recovered also indicated "the possible presence of seminal fluid" but the amount present—if any—was insufficient for typing. Lastly, Burton's lab report stated that "[t]ests on [Grimm's] saliva indicate the secretions are type A."[13]

After hearing this forensic evidence, combined with testimony from the officers who obtained Grimm's confession, the circuit court accepted Grimm's guilty pleas on all three counts and sentenced him to life in prison on the murder and abduction charges, plus 10 years on the sodomy charge.[14]

### Petition for a Writ of Actual Innocence[15]

In his Petition for a Writ of Actual Innocence, Grimm submits DNA analysis of the hairs, swabs, and stain on the towel recovered from his vehicle, analysis of the autopsy's toxicology report, and research and analysis alleging his confession was coerced. Each is discussed in turn.

---

[13] A person with Type A blood produces both A and H antigens, whereas a person with Type O blood only produces H antigens. If a person is a secretor, they secrete their antigens into other bodily fluids such as their semen or saliva. A non-secretor does not exhibit antigens in bodily fluids other than their blood. Laura Dean, *Blood Groups and Red Cell Antigens* 25 (2005).

[14] The circuit court imposed the life sentence for the murder charge only; the other life and 10 years' incarceration sentences were suspended.

[15] The Commonwealth joins Grimm's conclusion that the petition's scientific evidence is new, material, and not merely cumulative. Further, while the Commonwealth agrees the false confession analysis and expert report is newly discovered, it does not agree that it is material because the expert's opinion concerns Grimm's credibility and reliability and therefore invades the province of the fact finder.

A. DNA Recovered from the Hair

In 2011, the Virginia Department of Forensic Science ("DFS") performed DNA analysis of the eight hairs previously attributed to C.H. DFS used sequencing chemistry and linear array hybridization to analyze and compare mitochondrial DNA of the hairs previously tested by DFS in 1976 to the samples taken from C.H. From this analysis, DFS could exclude C.H. as the source of the hair from the sock, three of the four hairs from the Navy peacoat, and two of the three hairs from the front seat and floorboard of Grimm's car. As a result of this 2011 testing, DFS excluded C.H. as the source of six of the eight hairs. Testing of one of the hairs from the front floorboard was inconclusive due to a DNA base pair difference. Similarly, one of the hairs from the peacoat did not contain sufficient mitochondrial DNA to make a meaningful comparison.

In 2023, these remaining two hairs were tested by Mitotyping Technologies.[16] Mitotyping Technologies also compared the mitochondrial DNA of both the remaining hairs with the sample from C.H.[17] From this analysis, C.H. was excluded as the source of both hairs. Further, both hairs were determined to be from different sources. In sum, Grimm's petition submits DNA testing excluding C.H. as the source of all eight hairs.[18]

---

[16] In 2020 the General Assembly modified Code § 19.2-327.1 to permit testing by private laboratories. *See* 2020 Va. Acts ch. 1282.

[17] Because the available DNA in the hair samples was "minimal and degraded" Mitotyping Technologies used an "ancient DNA approach" which resulted in partial mitochondrial DNA profiles for all tested hairs.

[18] Grimm's petition also asserts that the type of hair comparison used in this case has since been scientifically debunked. *See Stevens v. Chapman*, No. 3:20cv352, 2021 U.S. Dist. LEXIS 61913, at *60 (E.D. Va. Mar. 30, 2021) ("microscopic hair comparison has been deemed scientifically invalid"); *see also* National Academy of Science, *Strengthening Forensic Science in the United States: A Path Forward* at 161, https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf ("In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value."). Because the DNA evidence here is sufficient on its own to exclude C.H. as the hairs' source this Court does not reach the question of the reliability of the science of hair comparison.

B.  DNA Recovered from the Autopsy Swabs

In 2002, DFS conducted DNA analysis of the swabs taken during the autopsy.  This analysis "eliminated [Grimm] as a possible contributor of the genetic material detected in" the swabs taken from the epiglottis, the esophagus, the oral cavity, and the non-sperm fractions of the pharynx swabs.  This testing further allowed DFS to determine that the DNA contained on these swabs originated from the same source.  These tests were inconclusive as to the source of the sperm fractions of the pharynx swabs and therefore could not eliminate Grimm.

In 2012, Orchid Cellmark retested the swabs as well as developed a DNA profile for C.H. himself.  These tests found no spermatozoa or evidence of seminal fluid.  Importantly, these tests indicated none of Grimm's DNA in the samples.

In 2017, due to these conflicting reports from DFS and Orchid Cellmark as to the presence of sperm in C.H.'s mouth, Forensic Analytical Sciences, Inc. ("FAS") examined the swabs themselves under high powered microscopes.  This analysis considered the amount of sperm—and consequently DNA—that would be anticipated to be recovered on an oral swab performed during an autopsy.  This report considers the degrading effect of bacteria in the human mouth, as well as the rate at which epithelial cells degrade compared to sperm cells.  This report also notes that "[o]nce [a] swab . . . [is] dried and stored appropriately, even at room temperature, the cellular material is effectively preserved for perpetuity."  FAS reported the presence of epithelial cells on the swabs and noted the absence of sperm cells.  Because cellular material essentially stops degrading when swabbed, the presence of epithelial cells indicates that if sperm cells had ever been present they would have also been preserved in the swabs.  Based on these findings, the FAS report concludes that "the observation of sperm on any of these same specimens . . . in 1975 must be mistaken."

C.  The Towel Recovered from Grimm's Car

In 2003, the towel recovered from Grimm's car and allegedly containing seminal fluid was sent to DFS for DNA testing.  DFS concluded that there was "[n]o blood or seminal fluid . . . observed on the towel."

- 9 -

Further, DNA testing was attempted but "[n]o human DNA was detected [in these samples] and no typing results were obtained."

D. Toxicology Report Analysis

The 1975 autopsy contained a toxicology report indicating the following in C.H.'s system at the time of his death: "0.12% ethanol wt/vol.; [and] 0.6 mg% chloroxazazone" in C.H.'s blood, "0.13% ethanol wt/vol.; 1.5 mg% chloroxazazone" in C.H.'s liver fluid, and "5.5 mg acetaminophen; 130 mg chloroxazazone; and 0.41 ml of 100% ethanol" in C.H.'s stomach. In 2023, Dr. Jeffrey Brent, a board-certified medical toxicology physician with a Ph.D. in biochemistry, reviewed the toxicology reports developed during the autopsy of C.H. In conducting this review, Dr. Brent considered the quantities of the substances present in C.H.'s system, the amount of food identified in his stomach, and his physical size. When all these factors are taken together, Dr. Brent concluded it was more probable than not that C.H. ingested the alcohol, chlorzoxazone, and acetaminophen within 90 to 150 minutes of his death. Dr. Brent further notes that based on "the significant difference in the concentrations of alcohol in the blood, organ fluids and bile compared to the quantity found in the gastric contents" the alcohol was likely absorbed into the system pre-mortem. While he does recognize that it would be physically possible for C.H.'s body to have reached those concentrations within 45 minutes, it is unlikely here based on the amount of food found in C.H.'s stomach.[19]

E. Grimm's Confession

Finally, Grimm's petition cites multiple articles detailing the relatively recent scientific study into false confessions. *See* Brandon L. Garrett, *Contaminated Confessions Revisited*, 101 Va. L. Rev. 395, 420 (2015); Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. Hum. Behav. 3, 14 (2010); Richard A. Leo et al., *Bringing Reliability Back In: False Confessions and Legal*

---

[19] In reviewing Dr. Brent's opinion, the Commonwealth consulted a DFS forensic toxicologist. The DFS toxicologist stated that the ethanol concentrations could have occurred between 60 and 120 minutes, and potentially in as few as 30-45 minutes. The Commonwealth notes that this slightly contradicts Dr. Brent but does not refute his own report. Further, the Commonwealth recognizes Dr. Brent's opinion likely makes the proposed timeline from Grimm's confession an impossibility.

- 10 -

*Safeguards in the Twenty-First Century*, 2006 Wis. L. Rev. 479, 514 (2006); Gisli H. Gudjonsson, *The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions*, 12 Frontiers Psychol. Feb. 2021. Further, Grimm presents a report from Dr. Richard Leo, Ph.D., J.D. Dr. Leo is a subject matter expert in false confessions and reviewed both the content and context of Grimm's confession.

DECISIONAL STANDARD

"A person seeking a writ of actual innocence faces a daunting task; the process begins not with a presumption that a petitioner is innocent, but rather, that he or she is guilty." *Haas v. Commonwealth*, 74 Va. App. 586, 624 (2022); *see also Tyler v. Commonwealth*, 73 Va. App. 445, 459 (2021) (recognizing that this Court begins "with the presumption that [petitioner]'s conviction, the result of a full criminal trial that has been affirmed on direct appeal, is correct"). "Because the petition is filed with us in the first instance, we are not reviewing a judgment below in the traditional appellate sense, and consequently, there is no appellate standard of review to apply." *Tyler*, 73 Va. App. at 458. "Rather, actual innocence petitions 'present[] one of the rare situations in which the General Assembly has charged an appellate court with engaging in factual evaluation.'" *Id.* (alteration in original) (quoting *Dennis v. Commonwealth*, 297 Va. 104, 127 (2019)).

Therefore, "[s]itting 'as a court of original jurisdiction[,]' we have 'the same authority to weigh and evaluate documentary and physical evidence as a trial court would have.'" *Id.* at 458-59 (second alteration in original) (quoting *Haas v. Commonwealth*, 283 Va. 284, 292 (2019)). In exercising such jurisdiction, this Court must consider "the record of any trial or appellate court action," Code § 19.2-327.11(D), and "the petition, the response by the Commonwealth, previous records of the case, the record of any hearing held under this chapter, and, if applicable, any findings certified from the circuit court pursuant to an order issued under this chapter[.]" Code § 19.2-327.13. The purpose of this review is "to allow us to perform the fact-finding function the General Assembly assigned us in the statutory scheme—determining whether the petitioner has produced sufficient new evidence to establish the statutory requirements to the requisite level of proof to warrant overturning a presumptively valid conviction." *Tyler*, 73 Va. App. at 459.

- 11 -

To successfully obtain a writ of actual innocence "the petitioner must present 'new' evidence" of his innocence. *Parson v. Commonwealth*, 74 Va. App. 428, 440 (2022) (quoting *Tyler*, 73 Va. App. at 463). To be considered "new," the petitioner "must prove both that [the evidence] was previously unknown or unavailable to him *and* that it could not have been discovered or obtained by the exercise of diligence within twenty-one days after the entry of final judgment." *Id.* (emphasis added) (citing Code § 19.2-327.11(A)(iv)(a), (vi)(a)). Additionally, such evidence must be material and not "merely cumulative, corroborative, or collateral." Code § 19.2-327.11(A)(vii), (viii).[20] Finally, the petitioner must establish that when his "new" and "material" evidence is "considered with all of the other evidence in the current record, [it] will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." *Parson*, 74 Va. App. at 441 (alteration in original) (quoting Code § 19.2-327.11(A)(vii)). "The petitioner must prove all these elements by a 'preponderance of the evidence.'" *Id.* (quoting *Tyler*, 73 Va. App. at 461).[21]

## ANALYSIS

### I. Changes in the law permit Grimm to bring this petition.

Before addressing the merits of Grimm's petition, this Court must assure itself that it has jurisdiction. *Johnson v. Commonwealth*, 72 Va. App. 587, 595 (2020). Code §§ 19.2-327.10 and -327.11(A) confer upon this Court jurisdiction over petitions for actual innocence based on non-biological evidence as well as over petitions involving both biological and non-biological evidence.[22] Here, Grimm's newly discovered evidence consists of both non-biological evidence—recent developments in the science of false confessions and new

---

[20] Code § 19.2-327.11(A)(vii), (viii) specifically state "(vii) that the previously unknown, unavailable, or untested evidence is material . . . (viii) that the previously unknown, unavailable, or untested evidence is not merely cumulative, corroborative, or collateral."

[21] "[T]he preponderance standard is satisfied when the evidence convinces a factfinder that a particular fact in dispute was 'more probable than not.'" *Parson*, 74 Va. App. at 441 (alteration in original) (quoting *Tyler*, 73 Va. App. at 461).

[22] The Supreme Court of Virginia has original jurisdiction over petitions based on biological evidence alone. *See* Code § 19.2-327.2 *et seq.*

toxicology analysis of C.H. based on advances in science—and biological evidence in the form of new DNA analysis of materials recovered from the scene.

But the jurisdictional analysis does not stop there. Prior to July 1, 2020, the fact that Grimm pleaded guilty to the crimes and that he had previously filed a petition in the Supreme Court for a writ of actual innocence would have prevented this Court from exercising jurisdiction to review the instant petition. The General Assembly amended Code § 19.2-327.10 in 2020 to remove those limitations. *See* 2020 Va. Acts chs. 993, 994; *Johnson*, 72 Va. App. at 595 (recognizing the 2020 changes to the actual innocence statute). As a result, Grimm's prior guilty pleas and multiple petitions do not interfere with this Court's jurisdiction over the current petition. Therefore, because Grimm has presented new non-biological evidence in his petition and because the law no longer divests this Court of jurisdiction, this Court properly has jurisdiction to consider the merits of Grimm's petition.

II. <u>Grimm's petition presents new, material evidence that is not merely cumulative, corroborative, or collateral.</u>

Turning to the merits of Grimm's petition, this Court now considers if he has presented new and material evidence of his innocence that is not merely cumulative, corroborative, or collateral.

A. <u>The evidence is new.</u>

"Petitions for actual innocence require 'new' evidence." *Tyler*, 73 Va. App. at 463. Evidence is new if it "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction . . . became final in the circuit court," and "is such as could not, by exercise of diligence, have been discovered or obtained before." Code § 19.2-327.11(A)(iv)(a), (vi)(a). For the following reasons, Grimm has satisfied these statutory requirements.

The first piece of new evidence Grimm presents is the DNA testing of the hairs, autopsy swabs, and towel that formed the forensic evidentiary basis for the circuit court accepting his guilty pleas. When Grimm pleaded guilty in 1976, DNA testing was not scientifically possible. *See* John M. Butler, *Fundamentals of Forensic DNA Typing*, National Inst. of Standards and Tech. at 4 (2010) ("DNA typing (profiling) as it is now

known, was first described in 1985."). Further, DNA testing was not recognized in Virginia courts as scientifically reliable and admissible evidence until 1989. *See Spencer v. Commonwealth*, 238 Va. 275 (1989) (finding that DNA evidence is reliable and affirming the trial court's admission of such evidence). The DNA evidence Grimm submits for this Court's consideration was undeniably unknown to Grimm, his counsel, and the trial court when he pleaded guilty. And no amount of diligence would have enabled him to find such DNA evidence before his convictions became final. Under such circumstances, the DNA evidence Grimm presents now is indeed "new" evidence.

The toxicology report prepared by Dr. Brent in 2023 is also new evidence. That report did not exist in 1976 and, as the report itself acknowledges, the process of determining if alcohol was absorbed pre- or post-mortem was not developed until the early 1980s. Just like the DNA evidence discussed above, the toxicology report and the scientific process used to generate it were previously unknown and could not have been discovered before Grimm's convictions became final. Consequently, Dr. Brent's report constitutes "new evidence."

As for Grimm's confession, the research and report he submits regarding police coercion are new. First, Grimm presents a body of social scientific research indicating that scientific understanding of false confessions was not researched until at least the mid-90s, *see* Saul M. Kassin et al., *On the General Acceptance of Confessions Research*, 73 American Psychologist 63, 64-65 (2018), with the seminal paper on the topic being published in 2010. Saul M. Kassin et al., *Police Induced Confessions: Risk Factors and Recommendations*, 34 L. Hum. Behavior 3 (2010). Just as with DNA testing, the science of false confessions was not understood until well after Grimm's confessions in 1976. Second, it appears that the expert report was prepared for this petition. Because of its recent preparation, and due to the recent developments in the understanding of false confession, this report could not have been discovered or produced at the time of the convictions. Therefore, this evidence could not have been discovered or opined upon at that time, regardless of due diligence by Grimm or his attorneys. Accordingly, the false confession evidence qualifies as "new evidence."

- 14 -

B. The evidence is material.

This Court next considers whether Grimm has shown that his newly submitted evidence "is material and, when considered with all the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." *Tyler*, 73 Va. App. at 462 (alteration in original) (quoting Code § 19.2-327.11(A)(vii)). To be material, evidence must "relate[] to a matter that is properly at issue in [this] case." *Bush v. Commonwealth*, 68 Va. App. 797, 806 (2018) (quoting *Turner v. Commonwealth*, 282 Va. 227, 250-51 (2011)). Code § 19.2-327.11(A)(vii) requires this Court "to examine the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Haas*, 74 Va. App. at 631 (quoting *In re Watford*, 295 Va. 114, 124 (2018)).

Under that standard, this Court must determine whether any rational trier of fact would have convicted Grimm after viewing his new evidence in combination with all the other evidence in the record. *See Bush*, 68 Va. App. at 807-08 (requiring this Court to "examine the likelihood of a reasonable [fact finder] finding [Grimm] guilty beyond a reasonable doubt once all of the evidence has been fairly considered" (quoting *Watford*, 295 Va. at 124)). "It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt." *Id.* at 808 (quoting *Watford*, 295 Va. at 124). Rather, Grimm must "establish such a high probability of acquittal, that this Court is reasonably certain that no rational fact finder would have found him guilty." *Id.* (quoting *Watford*, 295 Va. at 124).

Grimm's new evidence is material because it severs the alleged connections between him and C.H.'s murder. To be material under Code § 19.2-327.11(A)(vii), evidence must be true. "Manifestly, evidence that is false cannot be 'material' under the terms of the statute." *Knight v. Commonwealth*, 71 Va. App. 492, 508 (2020) (quoting *Carpitcher v. Commonwealth*, 273 Va. 335, 345 (2007)). Here, Grimm presents evidence that not only supports his claim of innocence but that also renders the Commonwealth's evidence false and thus unable to sustain Grimm's uncorroborated confession.

The physical evidence linking C.H. and Grimm in 1976 rested largely on the eight hairs recovered from Grimm's car and home, which purportedly belonged to C.H. The new DNA evidence, however,

- 15 -

definitively shows that C.H. is *not* the source of those hairs. Next, the Commonwealth's theory as to C.H.'s manner of death in 1976 was asphyxiation from semen left in the back of his throat after Grimm forced C.H. to perform oral sex on him. The new evidence Grimm presents to this Court not only proves that Grimm's DNA was not recovered from *any* of C.H.'s orifices, but also excludes the presence of *any* semen from C.H.'s mouth and throat. Finally, Dr. Brent's toxicology report indicates that the Commonwealth's timeline for the offense—the 75 minutes derived solely from Grimm's confession—would not have been sufficient time to allow C.H.'s body to absorb the amounts of alcohol recorded in the autopsy report. Viewed as a whole, this new evidence does not merely introduce the possibility of reasonable doubt. Rather, it eliminates all physical links between C.H. and Grimm, and undermines the alleged timeline of the offense. Further, when considered with the rest of the Commonwealth's evidence, it casts considerable doubt on the autopsy report and therefore leaves Grimm's confession as the only evidence of his guilt.

Turning to Grimm's confession, this Court must agree with the Commonwealth that Dr. Leo's report is not material because it opines as to Grimm's credibility and reliability in making his confession. This conclusion plainly invades the province of the fact finder at trial and thus is not appropriate for this Court to consider.[23]

Accordingly, Grimm's petition presents material evidence that, when considered together and against the whole of the trial court's evidence, is sufficient for this Court to reasonably believe that no rational fact finder would have convicted him. Indeed, when considered as a whole, there remains no inculpatory evidence by which Grimm would be found guilty beyond a reasonable doubt.

C. No rational trier of fact would have convicted Grimm of these offenses.

As discussed above, Grimm's new evidence negates the direct, forensic evidence upon which the Commonwealth relied to establish Grimm's guilt in 1976. Accordingly, the Commonwealth's only remaining evidence is Grimm's confession, the route he allegedly led the police on prior to his recorded confession, the

---

[23] Because Grimm's uncorroborated confession alone is insufficient to support his convictions, *see infra* Section II.C, this Court does not consider the body of scholarship concerning false confessions.

- 16 -

peacoat he told the police about that was later found in his own apartment, and the shoe he allegedly tore while disposing of C.H.'s body.

Considering this physical evidence first, the route, peacoat, and shoe do not indicate Grimm committed murder, abduction, or sodomy. And there is no independent source of evidence that confirms Grimm drove the route he said he did. Possessing a peacoat is not indicative of any crime. There is no witness to confirm Grimm tore his shoe disposing of the body, and the possession of a torn shoe is no indication of a crime. When taken together, this evidence is "just as consistent with non-commission of the offense as . . . with its commission." *Phillips v. Commonwealth*, 202 Va. 207, 212 (1960).

Finally, the Court considers Grimm's confession. In light of the foregoing discussions concerning Grimm's new evidence, there are no forensic links between Grimm and C.H., and the purported timeline of the offense does not fit. The other physical evidence—a peacoat and a torn shoe—are not indicative of any crime. Similarly, the location to which Grimm led the police during his confession had already been well publicized in the news media. With all of this excluded from Grimm's confession, the Commonwealth's evidence is C.H.'s body—containing inexplicable levels of alcohol and drugs and a debunked mechanism of death—and Grimm stating he did it—but on a different timeline, with no mention of providing C.H. substances of any kind, and in a manner proven to be incorrect. Indeed, the Commonwealth is left with a body and a man claiming responsibility without accurately describing any of this case's facts. Therefore, the confession by itself would not provide an adequate basis for a reasonable fact finder to convict. Accordingly, when Grimm's confession is "considered with all of the other evidence in the current record, [it] prove[s] that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." Code § 19.2-327.11(A)(vii).

D. <u>The evidence is not merely cumulative, corroborative, or collateral.</u>

Finally, this Court considers whether Grimm's evidence is cumulative, corroborative, or collateral. Code § 19.2-327.11(A)(viii). "Cumulative testimony is repetitive testimony that restates what has been said already and adds nothing to it. It is testimony of the same kind and character as that already given." *Bush*, 68

- 17 -

Va. App. at 809-10 (quoting *Massey v. Commonwealth*, 230 Va. 436, 442 (1985)). Grimm's evidence does not restate anything presented to the trial court, but rather demonstrates that the Commonwealth's evidence excludes Grimm as the criminal agent. Therefore, this new and material evidence adds a great deal of value and is not cumulative.

Corroborative evidence "is evidence that does not emanate from the defendant's mouth, does not rest wholly upon the defendant's credibility, but . . . adds to, strengthens, and confirms [the] defendant's testimony." *Haas*, 74 Va. App. at 629 (alterations in original) (quoting *Bush*, 68 Va. App. at 810). By negating "the evidence the factfinder relied upon to convict, the new evidence advances [Grimm's] claims of innocence without, in any way, depending on his testimony or evidence at trial." *Id.* at 630. Grimm's new evidence stems from advanced scientific analysis of the Commonwealth's own evidence. It does not rely on Grimm's credibility, but instead on the credibility of the Commonwealth's evidence. Accordingly, this new evidence is not corroborative.

"[C]ollateral evidence is evidence 'from which no fair inferences can be drawn tending to throw light upon the particular fact under investigation.'" *Tyler*, 73 Va. App. at 472 (alteration in original) (quoting *Bush*, 68 Va. App. at 810). Grimm's petition presents new evidence that directly attacks and discredits the evidence introduced against him. Indeed, Grimm's petition only responds to evidence that was used to support his guilty pleas; he does not address extraneous facts here. Accordingly, his evidence is not collateral.

E. <u>Grimm has met his burden of proof in this matter.</u>

As discussed above, a petitioner seeking a writ of actual innocence must present evidence that is both new and material, and he must establish that "when [such evidence is] considered with all of the other evidence in the current record, [it] will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." *Parson*, 74 Va. App. at 441 (third alteration in original) (quoting Code § 19.2-327.11(A)(vii)). "The petitioner must prove all these elements by a 'preponderance of the evidence.'" *Id.* (quoting *Tyler*, 73 Va. App. at 461). Grimm has done that here.

- 18 -

Grimm has shown by a preponderance of the evidence that the hairs linking him to this offense did not come from C.H.  Further, he has shown that the DNA present on the autopsy swabs did not come from him and that the towel is entirely devoid of DNA.  From the toxicology analysis, the Commonwealth's timeline of C.H.'s murder is not consistent with the amounts of substances found in C.H.'s system.  Each of these newly established facts removes the entirety of the Commonwealth's physical evidence in this case.  The only evidence remaining then is Grimm's confession.

Notwithstanding the context and circumstances of the confession, Grimm's confession does not contain accurate information concerning the timeline of these crimes or the mechanism of death.  Further, it omits any reference to the drugs and alcohol contained in C.H.'s system.  Accordingly, no evidence remains upon which a rational trier of fact would find proof of Grimm's guilt beyond a reasonable doubt.  For these reasons, this Court finds that Grimm is entitled to a writ of actual innocence.

## CONCLUSION

In 1976, limited by forensic technology, the trial court accepted Grimm's guilty pleas and convicted him of the abduction, sexual assault, and murder of C.H.  Since that time, Grimm has recanted his confession and presented newly discovered evidence of his innocence for this Court's consideration.  Based on careful review of the record and newly discovered biological and non-biological evidence, this Court grants Grimm's petition and issues a writ of actual innocence vacating the challenged convictions.  If there is no appeal from this judgment to the Supreme Court of Virginia, the clerk shall forward a copy of this writ to the Circuit Court of the City of Richmond where an order of expungement shall be entered immediately regarding the offenses at issue here.

This order shall be published.

A Copy,
Teste:

A. John Vollino, Clerk
*original order signed by a deputy clerk of the*
By:     *Court of Appeals of Virginia at the direction*
*of the Court*
Deputy Clerk

- 19 -